## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| STEPHANNIE LYNNE BAIRD, | CASE NO. 5:21-CV-00126-DAP |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Stephannie Lynne Baird filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 19, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

1

PROCEDURAL BACKGROUND

Ms. Baird filed for DIB on August 6, 2018, and for SSI on August 2, 2018, alleging in both applications a disability onset date of September 17, 2017. (Tr. 205, 211). Her claims were denied initially and on reconsideration. (Tr. 100, 115). She then requested a hearing before an Administrative Law Judge. (Tr. 154). Ms. Baird (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 18, 2019. (Tr. 46-77).

On April 30, 2020, the ALJ issued a written decision finding Ms. Baird not disabled. (Tr. 27-34). The Appeals Council denied Ms. Baird's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Baird timely filed this action on January 16, 2021. (ECF #1).

FACTUAL BACKGROUND

## I. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Baird was 30 years old at the time of her alleged onset date, and 33 years old at the time of the administrative hearing. (Tr. 50, 78). She completed high school. (Tr. 52). In the past, Ms. Baird has been employed as a cashier at Giant Eagle and Walmart, and as a grocery bagger at ACME grocery. (Tr. 69-70).

## II. ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Baird and VE Bruce Holderead that was presented during the hearing before the ALJ.

In opening statement, counsel for Ms. Baird explained that she struggles with depression and anxiety and gets easily overwhelmed. (Tr. 49).

Ms. Baird testified that she lives with her parents, her daughter, and her sister. (Tr. 51). She does not drive, does not have a driver's license, and relies on her parents for transportation. (Tr. 52). Ms. Baird's father drives her daughter to and from school. (*Id.*). Ms. Baird completed high school. (*Id.*). She worked at Giant Eagle and Walmart as a cashier and at ACME bagging grocery items and bringing in grocery carts. (Tr. 53-54).

Ms. Baird testified she struggles to deal with society. (Tr. 56). She tearfully explained she gets nervous around other people and just wants to hide. (*Id.*). In response to the ALJ's question about how she dealt with these issues while working as a cashier, Ms. Baird said she would be in the bathroom "all the time." (*Id.*). She was fired from Walmart for attendance issues. (*Id.*).

Ms. Baird treats with Portage Path Behavioral Health and receives counseling services from a therapist at Talk It Out. (*Id.*). She sees her therapist every Thursday for an hour. (Tr. 66). Ms. Baird takes Geodon, serotonin, an anti-anxiety drug, and blood pressure medication. (Tr. 57). Her morning medications make her sleepy, resulting in four- or five-hour naps during the day. (*Id.*).

Ms. Baird experiences panic attacks triggered by going to unfamiliar places or dealing with unfamiliar people when her family is not with her. (Tr. 58). She has panic attacks several times a day, which last about fifteen to twenty minutes each. (*Id.*). Ms. Baird uses coping skills, like journaling, breathing exercises, and listening to music to get through a panic attack. (Tr. 59). These coping mechanisms help shorten the duration of a panic attack. (*Id.*). When her anxiety is up, Ms. Baird has racing thoughts and hears voices. (Tr. 63). The voices "come and go" and are present when she tries to sleep. (*Id.*). Ms. Baird estimates she sleeps about three to four hours a night. (Tr. 64).

Ms. Baird also has depression that comes with crying spells that occur a few times a week, at night. (Tr. 59). Ms. Baird was diagnosed with obsessive compulsive disorder (OCD), with tendencies that include looking in a mirror a lot and counting things five to ten times. (Tr. 59). Ms. Baird has memory issues and explained she misplaces items, such as her cell phone, house keys, and ID. (Tr. 60). She needs reminders to take care of her personal needs, such as personal care and bathing. (Tr. 64). Ms. Baird testified she does not always recognize when she needs to take her anti-anxiety medications. (Tr. 65). Ms. Baird's mother helps her with paperwork and, when Ms. Baird was working, her mother helped manage her money. (*Id.*).

Ms. Baird endorsed difficulty getting along with the people with whom she lives. (Tr. 61). She verbally lashes out when she feels her family is harping on her for past issues, or for not completing chores. (Tr. 61-62). Other than family, Ms. Baird does not see anyone else on a regular basis and stated she does not have any friends. (Tr. 62). With the exception of attending medical and counseling appointments (for herself and her daughter), Ms. Baird does not go anywhere on a regular basis. (Tr. 62, 75). She helps her dad do the grocery shopping once a month. (Tr. 62). She does not do anything else outside the home, such as go to the movies or out to eat. (*Id.*). Ms. Baird used to attend church but not anymore. (*Id.*).

The VE then testified. He classified Ms. Baird's past relevant work as Cashier II, DOT 211.462-010, unskilled, light exertion, and as a Bagger, DOT 920.687-014, unskilled, medium exertion. (Tr. 69-70). The ALJ asked the VE if a hypothetical individual of Ms. Baird's age, education, and work history, could perform Ms. Baird's past relevant work if subject to the following non-exertional limitations: limited to performing simple, routine, and repetitive tasks; no work at a high production-rate pace, such as assembly line work; occasionally interact with

4

supervisors and a small group of familiar co-workers; no more than incidental interaction with the general public; limited to superficial contact, meaning no sales, arbitration, negotiation, conflict resolution, or confrontation; no group, tandem, or collaborative tasks; no management, direction, or persuasion of others; and can respond appropriately to occasional changes in a routine or relatively static work setting, with changes to be explained and/or demonstrated in advance of gradual implementation. (Tr. 70-71). The VE testified such an individual could not perform Ms. Baird's past relevant work, but could perform in other unskilled positions, including:

- Cleaner, Laboratory Equipment (DOT 381.687-022), medium exertion;

- Laundry Worker II (DOT 361.685-018, medium exertion; and

- Cleaner, Hospitality (DOT 323.687-010, medium exertion.

(Tr. 71-72).

If the hypothetical individual was further limited to only occasional interaction with supervisors and no interaction or contact with co-workers or the general public, the individual would be precluded from work. (Tr. 72-73).

## III.  RELEVANT MEDICAL EVIDENCE

On September 19, 2017, Ms. Baird went to the emergency department with complaints of anxiety and depression. (Tr. 292). Ms. Baird explained she has a sick daughter and was becoming anxious and depressed over her condition. (*Id.*). She received Ativan at the emergency department and was discharged with a prescription for ten additional Ativan tablets. (Tr. 293).

On September 20, 2017, Ms. Baird met with Scott Everett, M.D., a physician at Barberton Family Practice(Tr. 327). She told Dr. Everett that she suffers from untreated bipolar disorder, noting that her sister has the disorder and that Ms. Baird's daughter was diagnosed with

schizophrenia and bipolar disorder two weeks prior. (Tr. 328). Ms. Baird claimed she has experienced anxiety and depression for thirteen years without seeing anyone for the conditions or taking any medication. (*Id.*). Ms. Baird reported having gone through many jobs because she cannot control her symptoms. (*Id.*). She endorsed symptoms of mania, including staying up for days on end, racing thoughts, pressured speech, and spending money she does not have. (*Id.*). Ms. Baird reported symptoms of depression, including crying a lot, not getting out of bed, losing interest in things she used to enjoy, decreased sleep, decreased appetite, decreased energy, decreased concentration, and guilt. (*Id.*).

Dr. Everett noted Ms. Baird's mood was both anxious and depressed, and that she appeared withdrawn. (Tr. 329). He also noted her speech was not rapid, pressured, or slurred, she was not agitated or aggressive, and her cognition and memory were not impaired. (*Id.*). Dr. Everett referred Ms. Baird to a psychiatrist and prescribed Abilify for acute symptoms until Ms. Baird could establish a psychiatric appointment. (*Id.*).

Ms. Baird returned to Barberton Family Practice for a follow-up appointment and saw Andrea Konkoly, M.D., on October 3, 2017. (Tr. 332). Ms. Baird thought she might have bipolar disorder and reported anxiety, worrying about everything, crying often, keeping to herself, sleep disturbances, racing thoughts, no energy, and decreased concentration that makes it difficult to complete daily tasks. (*Id.*). Ms. Baird stated she was on leave from her job as a cashier because she "stresses out over everything" and "cannot function." (Tr. 333). She also claimed to spend money excessively on cell phones and hair products. (*Id.*). Dr. Konkoly noted Ms. Baird did not exhibit rapid or pressured speech but appeared anxious and depressed. (*Id.*). Dr. Konkoly noted Ms. Baird had a psychiatric appointment with Portage Path the next week and prescribed Buspar. (*Id.*).

On October 11, 3017, Ms. Baird attended her initial appointment with Portage Path. (Tr. 345). She reported auditory hallucinations, daily sadness, decreased sleep, fatigue, forgetfulness, inattention, mania, mood swings, nervousness, panic attacks, poor concentration, and restlessness. (*Id.*). Ms. Baird noted she had taken Buspar for one week and that it was not helping. (*Id.*). The medication made her dizzy and drowsy. (*Id.*). She endorsed feeling hopeless, helpless, and worthless and having panic attacks on a regular basis. (Tr. 346). Ms. Baird also reported having a difficult time keeping jobs because she gets depressed and does not want to leave her house. (*Id.*). Ms. Baird explained her mental health symptoms began after being sexually assaulted at age 16 and have worsened over the years. (*Id.*). Ms. Baird was cooperative, but her mood was anxious and depressed. (Tr. 349). She was diagnosed with major depressive disorder, severe with psychotic features, and PTSD. (Tr. 351).

Ms. Baird returned to Barberton Family Practice on October 18, 2017 with a sore throat and nasal congestion. (Tr. 336). She reported stress from a mood disorder and requested paperwork writing her off work. (Tr. 337). Ms. Baird received nasal spray to help with congestion. (Tr. 338). The doctor noted Ms. Baird became tearful when informed she could return to work. (*Id.*).

On January 29, 2018, Ms. Baird returned to Portage Path for a psychiatric evaluation with Aasia Kamal Syed, M.D. (Tr. 353-59). Ms. Baird endorsed auditory hallucinations (the devil telling her to do bad things, like stealing, and commentary such as "I am so ugly, no one likes me"), low energy and motivation, feelings of guilt, racing thoughts, easy fatigability, three to four panic attacks a week, social phobia, OCD symptoms (counting money four or five times, rearranging paperwork, and looking in the mirror often), anger (screams at her mother four to five times a day

7

for no reason), and impulsivity (buying cell phones, hair products, and purses even if she does not have the money). (Tr. 353-55). Dr. Syed noted Ms. Baird's speech was clear, thought process was logical, judgment and insight were fair, she was alert and oriented, and displayed an anxious and depressed mood. (Tr. 356). Dr. Syed also found cognitive impairment in her attention and concentration. (*Id.*). Dr. Syed diagnosed her with major depressive disorder, severe with psychotic features, PTSD, panic disorder, and OCD. (Tr. 357). Dr. Syed prescribed Latuda to address psychotic features and Zoloft for depression, anxiety, PTSD, and OCD symptoms. (*Id.*).

Ms. Baird saw Dr. Syed for medication management on March 12, 2018. (Tr. 361). She reported "not hearing voices as much," but remained anxious. (*Id.*). She complained of an urge to walk about taking Latuda. (*Id.*). She rated her depression and anxiety as moderate. (*Id.*). Mental status examination was normal, and Dr. Syed noted she displayed "good attention and concentration with minimal distractibility." (Tr. 362). Dr. Syed indicated Ms. Baird's depression, panic disorder, and OCD were "stable or improved," and continued her prescription for Latuda, increased her dosage of Zoloft, and added Benadryl for insomnia (*Id.*).

In April 2018, Ms. Baird returned to Dr. Syed's office for a follow-up appointment. (Tr. 367). She reported feeling "slightly better," that she had stopped taking Benadryl out of concern for high blood pressure, and that she reduced her dosage of Latuda in half. (*Id.*). Dr. Syed cautioned Ms. Baird about making medication changes without informing her doctor. (*Id.*). Ms. Baird showed good attention and concentration with minimal distractibility and mental status examination was normal. (Tr. 368). Dr. Syed determined her depression, PTSD, and panic disorder were "stable or improved." (Tr. 369). Dr. Syed discontinued Latuda and Benadryl at Ms.

Baird's request, continued Zoloft, added Geodon for depression and paranoia, and started Cogentin. (*Id.*).

Ms. Baird started attending individual therapy appointments in June 2018. (Tr. 373). She met with practitioner Elizabeth Couts, LPCC, who noted Ms. Baird exhibited impaired concentration and attention, flat affect, was agitated and restless, and displayed an anxious and depressed mood. (*Id.*).

In July, Ms. Baird saw Dr. Syed for medication management. (Tr. 376). She endorsed feeling depressed lately but felt she was moving in the right direction and reported symptom improvement with medication. (*Id.*). Ms. Baird discussed her frustration with her mother's "constant nagging" and her father's paranoia, and stated she was considering applying for subsidized housing for her and her daughter and for SSI. (*Id.*). Mental status examination was normal, and she displayed good attention and concentration with minimal distractibility. (Tr. 377). Dr. Syed determined Ms. Baird was "stable or improved" in relation to all diagnoses and increased her dosage of Geodon. (Tr. 379).

On July 17, 2018, Ms. Baird met with Ms. Couts for individual therapy. (Tr. 382). Ms. Baird reported feeling upset about her inability to make decisions and expressed anxiety about her employer's attempts to communicate with her about returning to work. (*See* Tr. 382-83). Ms. Baird requested Ms. Couts write her employer a letter saying that she could not work; Ms. Couts declined to do so. (Tr. 383).

On August 1, 2018, Ms. Baird came to Portage Path's walk-in hours to request a letter for work. (Tr. 385). The medical record indicates Ms. Baird had a telephone conversation with Ms. Couts the week prior about this request and Ms. Couts, after discussion with the prescribing

physician, determined she would not write the requested letter. (*Id.*). On the phone call, Ms. Baird was upset but expressed understanding. (*Id.*). When Ms. Baird came to the clinic during walk-in hours, she was aggressive, demanding, and irritable, exhibiting poor insight and judgment and an obsessive thought pattern. (*Id.*). Ms. Couts explained the reasons for declining to write a letter to Ms. Baird's employer. (*Id.*).

On August 10, 2018, Ms. Baird was anxious about an issue with her daughter. (Tr. 388). When asked about work, Ms. Baird stated she was ignoring her employer. (Tr. 389). In September, Ms. Baird told Ms. Couts she felt her anxiety was too great to return to work. (Tr. 412).

In October 2018, Ms. Baird returned to Dr. Syed's office for medication management. (Tr. 417). Ms. Baird reported having two to four outbursts of anger a week, hearing voices two to four times a week, and crying two to four times a week. (Tr. 417-18). Mental status examination was normal, except Dr. Syed noted impaired attention and concentration. (Tr. 418). Dr. Syed increased her dosage of Zoloft and started Vistaril for anxiety and insomnia, noting that Ms. Baird's auditory hallucinations are related to her anxiety and "calm[] down when she is calmer." (Tr. 420).

On November 12, 2018, Ms. Baird met with Ms. Couts for individual therapy. (Tr. 423). Ms. Baird discussed her relationship with a boyfriend and talked about sneaking out to see him and the worries she has about her daughter. (*Id.*). Ms. Baird reported that her recent medication change is working; the auditory hallucinations, while still present, were less frequent. (*Id.*).

In January 2019, Ms. Baird saw a new therapist, Michelle Snyder, LPCC. (Tr. 449). Ms. Snyder noted Ms. Baird appeared anxious and depressed and her speech was pressured. (*Id.*). Ms. Baird reported the medications help her anxiety and depression symptoms and helping her sleep

10

better. (Tr. 450). She attributed some anxiety to her daughter's mood and school issues. (*Id.*). Ms. Baird endorsed hearing voices when stressed. (*Id.*).

In January 2019, Ms. Baird saw Dr. Syed for medication management. (Tr. 452). She reported being anxious and using Vistaril for panic attacks at least twice a week. (*Id.*). Dr. Syed noted "her over all [*sic*] anxiety and social anxiety, easy irritability and feelings of being overwhelmed are obvious during this session." (*Id.*). Dr. Syed described her thought content as paranoid. (Tr. 453). She continued Ms. Baird's prescriptions for Zoloft and Vistaril, and increased her dosage of Geodon to address her depression and paranoia. (Tr. 455).

The next day, Ms. Baird met with Ms. Snyder for individual therapy. (Tr. 458). There, she reported high anxiety and that she had stayed up all night because Dr. Syed informed her that Ms. Snyder would be leaving the practice. (Tr. 459).

On March 25, 2019, Ms. Baird saw Dr. Syed for medication management. (Tr. 461). She informed Dr. Syed that she began seeing a counselor at Talk It Out. (*Id.*). She reported better sleep and improved depression and anxiety, panic attacks once or twice a week, no nightmares or auditory hallucinations, and decreased paranoia. (*Id.*). Dr. Syed continued Ms. Baird's prescriptions for Zoloft and Vistaril, and increased her dosage of Geodon again to address depression and paranoia. (Tr. 464).

Ms. Baird met with Tammy Zender, LISW-S, on March 27, 2019, for individual therapy. (Tr. 492). She discussed her medications with Ms. Zender, noting that Latuda made her restless and Geodon made her tired. (*Id.*). Ms. Baird reported using art therapy several times a day to reduce stress and anxiety. (*Id.*). Ms. Baird also discussed issues she was having with her boyfriend. (*Id.*).

Ms. Baird saw Ms. Zender again on April 3, 2019. Ms. Zender noted Ms. Baird appeared motivated to improve, as evidenced by completing assigned therapy worksheets and discussing her use of coping skills to manage anxiety, anger, and depression. (Tr. 493). Ms. Baird expressed anxiety and depression about her relationship with her mother and sister, stating that they trigger feelings of worthlessness and depression. (*Id.*). Ms. Baird continued to use art therapy to reduce stress and anxiety, stating that it helps. (*Id.*).

Ms. Baird met with Ms. Zender again in May 2019. (Tr. 494). Ms. Baird discussed talking with a new man she met over the internet and the stress levels at home. (*Id.*). She denied concerns about medications and reported taking them as prescribed. (Tr. 495). She reported some increased anxiety in the past two weeks due to her father being ill. (*Id.*).

Ms. Baird returned to Dr. Syed on May 20, 2019 for medication management. (Tr. 467). She reported the medications and counseling were helpful, but she continued to have anxiety, paranoia, and depression. (*Id.*). Mental status examination was normal, except Dr. Syed noted her impaired attention and concentration. (Tr. 468). Dr. Syed continued Ms. Baird's prescriptions for Zoloft and Vistaril, and increased Geodon to address depression and paranoia. (Tr. 469).

Ms. Baird saw Ms. Zender on June 5, 2019 for individual therapy. (Tr. 496). She expressed feeling anxious about Dr. Syed leaving Portage Path and meeting a new doctor. (Tr. 497). Ms. Baird endorsed feeling increased anxiety with going to any appointments, and decreased anxiety when she is home. (*Id.*).

On July 17, Ms. Baird discussed planning a small birthday party for her daughter and getting school shopping completed. (Tr. 498). She reported "a little more" anxiety due to being

sick with a sinus infection for almost two weeks, and having her medication management appointment rescheduled. (*Id.*). Ms. Baird also reported using music therapy as a coping skill. (*Id.*).

In July 2019, Ms. Baird met with Carol Lewis, M.D., Dr. Syed's replacement, for medication management. (Tr. 479). Ms. Baird expressed being anxious about meeting Dr. Lewis. (Tr. 480). She reported feeling paranoia and auditory hallucinations when stressed. (Tr. 479). Ms. Baird explained the increased Geodon was helpful, but that the morning dosage makes her tired, though caffeine helps. (*Id.*). Mental status examination was normal, and Dr. Lewis noted Ms. Baird displayed good attention and concentration with minimal distractibility. (Tr. 480).

In August, Ms. Baird saw Ms. Zender for individual therapy. (Tr. 499). She reported feeling increased anxiety with louder noises and talking, people walking, or other activities at the home. (*Id.*). She was agitated due to all the medical appointments she had to attend for her disability application. (*Id.*). Later that month, she expressed anxiety about the family dog being ill and about her daughter being back in school. (Tr. 500).

In September, Ms. Baird reported that her symptoms of anxiety and irritability were unchanged. (Tr. 501). She discussed her upcoming disability claim and "became very upset and agitated when challenged about her inability to work or not work." (*Id.*). Ms. Baird informed Ms. Zender she was fired from her position at Walmart for absences and circumstances surrounding her sexual relationship with a fellow employee. (*Id.*). Ms. Zender determined Ms. Baird's case would be transferred to Sarah Melton, LPCC, for long-term, ongoing supportive therapy. (*Id.*).

Ms. Baird met with Ms. Melton the following week for individual therapy. (Tr. 502). Ms. Baird reported feeling nervous about her disability hearing. (*Id.*). Ms. Baird also indicated she liked homework, so Ms. Melton offered homework sheets for Ms. Baird to complete between

appointments. (*Id.*). At Ms. Baird's next appointment, she reported experiencing anxiety around others and expressed a desire to learn how to reduce that anxiety and interact better with others. (Tr. 503).

In October, Ms. Baird reported to Ms. Mellon that she had a lot of anxiety when she went to a former workplace with her family. (Tr. 505). Ms. Baird was anxious about what people might be saying or thinking about her. (*Id.*). She reported these types of thoughts often impair her ability to work or function in public. (*Id.*). Later that month, Ms. Baird presented as anxious and reported having several panic attacks in the past week. (Tr. 507). In November, Ms. Baird reported "all has been going well," and she was considering introducing the man she had been dating to her family. (Tr. 509).

Ms. Baird saw Dr. Lewis again in November 2019 for medication management. (Tr. 484). Ms. Baird reported feeling better, with fewer auditory hallucinations. (*Id.*). Ms. Baird expressed feeling anxious about her upcoming disability hearing. (*Id.*). Mental status examination was normal, and Ms. Baird displayed good attention and concentration with minimal distractibility. (Tr. 485).

On November 14, 2019, Ms. Baird saw Ms. Mellon for individual therapy. (Tr. 510). She reported things were going well, but mentioned feeling regretful for not having asked her psychiatrist to reduce her morning dose of Geodon because it made her tired throughout the day. (*Id.*). Later that month, Ms. Baird reported that everything was going well. (Tr. 512). She discussed the stress of the holidays and family dynamics. (*Id.*).

On December 5, 2019, Ms. Baird met with Ms. Mellon and reported feeling anxious about an upcoming court hearing and her daughter's reaction to prescription medication. (Tr. 514). On

14

December 12, Ms. Baird reported feeling sad and anxious because the family dog passed away over the weekend. (Tr. 516). On December 26, 2019, Ms. Baird reported having some anxiety, but nothing overwhelming. (Tr. 520).

In April 2020, Ms. Baird met with Crystal Snyder, LPC, for individual therapy. Ms. Baird discussed her anxieties relative to the coronavirus pandemic and expressed feeling lonely in isolation with her family. (Tr. 528).

## IV.  MEDICAL OPINIONS

State Agency medical consultants reviewed Ms. Baird's records. At the initial level, Patricia Kirwin, Ph.D., determined Ms. Baird has a mild limitation in her ability to understand, remember, and apply information, and moderate limitations in her abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (Tr. 83). Dr. Kirwin performed the mental residual functional capacity (RFC) assessment and, in relation to concentration and persistence limitations, determined Ms. Baird was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods of time, work in coordination with or in proximity of others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 85-86). Dr. Kirwin opined Ms. Baird can maintain concentration and attention to complete one- to six-step tasks. (Tr. 86).

As to her social abilities, Dr. Kirwin determined Ms. Baird was moderately limited in her abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers and peers without

15

distracting them or exhibiting behavioral extremes. (*Id.*). Dr. Kirwin opined Ms. Baird can maintain superficial interaction in the workplace. (*Id.*). Finally, Dr. Kirwin determined Ms. Baird was moderately limited in her ability to respond appropriately to changes in the work setting. (*Id.*). Dr. Kirwin opined Ms. Baird's symptoms may be exacerbated by stressful situations and, in light of that, Ms. Baird "should perform tasks that have infrequent changes and do not have fast paced demands or strict production quotas. [She] retains the ability to complete tasks in an environment in which changes are occasional and explained in advance." (Tr. 87).

On reconsideration, Paul Tangeman, Ph.D., affirmed Dr. Kirwin's findings and set forth the same opined limitations. (*See* Tr. 112-13).

## V.  OTHER RELEVANT EVIDENCE

In August 2018, Ms. Baird completed an Adult Function Report detailing how her mental health impairments limit her activities. (Tr. 240-47). She suffers from anxiety attacks, OCD, PTSD, and mood swings. (Tr. 240). On a typical day, Ms. Baird gets up at 6:00 a.m., has coffee, goes back to bed, gets up at 9:00 a.m. for breakfast and to take her pills, goes back to bed, gets up at 2:00 p.m. to fix her hair and take her pills, eats supper, takes more pills, and then goes to bed. (Tr. 241). She is responsible for taking care of her daughter but receives help from her mother. (*Id.*). Ms. Baird needs reminders to bathe. (Tr. 242). She also stands in the mirror for hours fixing her hair. (Tr. 241). Ms. Baird does not prepare meals other than simple sandwiches, and does not perform household chores because these activities lead to stress and anxiety attacks. (Tr. 242-43). Ms. Baird endorsed having problems getting along with her mom, with whom she argues all the time, and has disagreements with her daughter. (Tr. 245).

16

Ms. Baird only leaves the house to attend medical appointments, or to shop for personal items once a month. (Tr. 243). She does not go out alone because being around people brings on panic attacks. (*Id.*). Ms. Baird claims she "cannot stand to be with people" because it brings on anxiety. (Tr. 245). She does not handle stress or changes in routine well. (Tr. 246). Ms. Baird's OCD makes it difficult for her to handle money because she must count it five or six times. (Tr. 243). She enjoys writing in her journal, watching television, and listening to music daily. (Tr. 244). Ms. Baird endorsed being able to pay attention for thirty minutes before her mind wanders. (Tr. 245).

## THE ALJ'S DECISION

The ALJ's decision, dated April 30, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since September 17, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: schizoid personality disorder; depressive disorder; mood disorder; affective disorders; anxiety disorder; panic disorder; obsessive compulsive disorder; and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can perform simple, routine and repetitive tasks, but cannot perform tasks that require a high production rate pace such as assembly line work; can interact

on an occasionally basis with supervisors and a small group of familiar coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others; and can respond appropriately to occasional change in a routine and relatively static work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 15, 1986 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 17, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 29-37).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

18

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &
Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if
supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d
830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial
evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh
the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if
substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the
court cannot overturn "so long as substantial evidence also supports the conclusion reached by the
ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a
"zone of choice" within which the Commissioner can act, without fear of court interference.
*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150
(8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the
record. Substantiality of evidence must be based upon the record taken as a whole. Substantial
evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of
evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v.
Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the
record to support the decision, [where] the reasons given by the trier of fact do not build an
accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.
2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f)

and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Baird first contends that remand is required because Andrew Saul, the former

Commissioner of the Social Security Administration (SSA), was appointed in violation of the

separation of powers. (Pl.'s Br., ECF #13, PageID 607). She also contends the ALJ's analysis of the

applicable Listings was improper. (Pl.'s Br., ECF #13, PageID 610-13, 614-15). Finally, she argues

the ALJ did not properly consider "the effect of the combination of her psychological impairments

and whether they supported the RFC he proffered." (Pl.'s Br., ECF #13, PageID 615).

On review, I find that none of her contentions have any merit. I analyze each in turn

below.

## I.    **Ms. Baird's constitutional challenge fails.**

As a threshold matter, I conclude Ms. Baird has not forfeited her ability to raise her

constitutional challenge despite not first raising the issue during the administrative proceedings.

(See Pl.'s Reply Br., ECF #18, PageID 659). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme

Court held a claimant does not need to exhaust a constitutional claim at the administrative level,

but instead may present such a claim for the first time at the district court level. *Id.* at 1362.

However, this rule does not change Sixth Circuit precedent (see *Ramsey v. Comm'r of Soc. Sec.*, 973

F.3d 537 (6th Cir. 2020)), nor does it change the claimant's requirement to raise the issue in the

opening brief or else waive the claim. *Kathrine R. v. Kijakazi*, No. 2:19-CV-00334-FVS, 2021 WL

3854431, at *3-4 (E.D. Wash. Aug. 27, 2021) (finding that *Carr* did not change existing precedent that claimant could have, but did not, raise an Appointments Clause claim in her opening brief, and thus declining to amend or alter judgment).

However, I note that Ms. Baird's Complaint does not reference any potential constitutional challenges. (ECF #1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint need not provide "detailed factual allegations," but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* In her Brief, Ms. Baird grounds her constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to give notice of the claim when she filed her Complaint in January 2021. Accordingly, her constitutional claim – advanced for the first time in her Merits Brief (ECF #13) – is procedurally improper. *See, e.g., Butcher v. Comm'r of Soc. Sec.*, No. 2:20-CV-6081, 2021 WL 6033683, at *6 (S.D. Ohio Dec. 21, 2021), *report and recommendation adopted sub nom. Christina B. v. Comm'r of Soc. Sec.*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

Even if considered on its merits, however, Ms. Baird's constitutional claim fails. Andrew Saul became Commissioner of SSA on June 17, 2019, pursuant to 42 U.S.C. § 902(a). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id*. The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (Pl.'s

22

Br., ECF #13, PageID 607; Comm'r's Br., ECF #17, PageID 637). *See also Seila Law LLC v. CFPB*,
140 S. Ct. 2183, 2191 (2020) (statutory restriction on the President's ability to remove the head of
an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is
unconstitutional); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on
the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or
malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law*, the Supreme Court held that a statutory provision allowing the President to
remove the Director of the Consumer Financial Protection Board (CFPB) only for "inefficiency,
neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers
doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court
also found that the unconstitutional removal provision was severable from the other provisions of
the relevant statute, thereby maintaining CFPB intact as an agency. *Id.* at 2208, 2211. The
Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging
actions taken by the head of an agency who derived powers from a statute that included an
unconstitutional removal provision.

The Court subsequently addressed this issue in *Collins v. Yellen*. There, the Court
confronted a similar statute that governed removal of Directors of the Federal Housing Finance
Agency (FHFA). The *Collins* majority held that "[a]lthough the statute unconstitutionally limited
the President's authority to remove the confirmed Directors, there was no constitutional defect in
the statutorily prescribed method of appointment to that office. As a result, there is no reason to
regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

23

The *Collins* Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S. Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment") (citing *Seila Law*, 140 S. Ct. at 2207–11). Rather, "to obtain reversal of an agency decision, a plaintiff would need to demonstrate compensable harm flowing from the unconstitutional removal clause." *Id.* at 1788-89. The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

Id. at 1789. Notably, each of these examples require the President to acknowledge being prevented from removing an agency head due to the unconstitutional statutory provision. Ms. Baird has made no such allegation in her constitutional argument.

In this case, the parties disagree as to the effect the unconstitutional removal restriction has on the ALJ's determination of Ms. Baird's DIB and SSI applications. Ms. Baird argues Commissioner Saul's appointment violated the separation of powers, thereby depriving him of authority to carry out the functions of his office, including the delegation of authority to the adjudicating ALJ or Appeals Council who determined her benefits claim and, therefore, she is entitled to remand for a de novo hearing. (Pl.'s Br., ECF #13, PageID 607-08, see also Pl.'s Reply Br., ECF #18, PageID 659). The Commissioner disagrees, noting that the ALJ who adjudicated Ms. Baird's claim held office under an appointment legally ratified in July 2018 by then-Acting

24

Commissioner Nancy Berryhill. (Comm'r's Br., ECF #17, PageID 639). The Commissioner also asserts that Ms. Baird has not shown she was actually harmed by the unconstitutional removal restriction. (Comm'r's Br., ECF #17, PageID 639-44).

Acting Commissioner Berryhill—who ratified the appointment of ALJ Schmitz—was removable at-will and was not subject to § 902(a)(3)'s removal provision. (*Id.* at PageID 639-41; *see also Collins*, 141 S. Ct. at 1781) (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections). Section 902(b) confirms there are no removal restrictions for an Acting Commissioner. Thus, there is no nexus between Acting Commissioner Berryhill's ratification of ALJ Schmitz's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Ms. Baird has not shown that Acting Commissioner Berryhill or ALJ Schmitz lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3), or that she suffered harm as a result.

Even if former Commissioner Saul had appointed ALJ Schmitz, the unconstitutionality of the removal provision does not deprive Commissioner Saul of the ability to delegate power to others to decide the claim. The doctrine of severability applies where, as the Supreme Court explained in *Seila Law*, "one section of a statute may be repugnant to the Constitution without rendering the whole act void." 140 S. Ct. at 2208. *Seila Law* found the unconstitutional removal provision was severable from the remaining statute because the CFPB was capable of functioning independently even if the provision is stricken. *Id.* at 2209-10.

The same result obtains here, because "[i]f the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional." *Butcher*, 2021 WL 6033683, at *7 (citing *Alice A. v. Comm'r of Soc. Sec.*, No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding the plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration)). Moreover, Ms. Baird's argument that the former Commissioner did not have authority to carry out the functions of office because the removal restriction was unconstitutional was already rejected by the Supreme Court in *Collins*. 141 S. Ct. at 1788. She must still show she suffered compensable harm flowing from the removal clause. *Id.*

Ms. Baird's Reply Brief attempts to raise these claims of harm, but the claims are disconnected both from § 902(a)(3)'s removal provisions, and from any compensable harm she may herself have suffered. Ms. Baird asserts former Commissioner Saul implemented policy changes that affected the ALJ's decision, namely Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-2-3-20, in effect July 17, 2019, and POMS DI 34121.013 and DI 34121.015. (Pl.'s Reply Br., ECF #18, PageID 660). She claims the HALLEX provision "modified the way in which decisions were written." (*Id.*). I conclude it does no such thing. HALLEX I-2-3-20, titled "Acknowledgment of Notice Hearing," describes how the SSA provides an Acknowledgment of Receipt form with each notice of hearing it sends to a claimant. In any event, Ms. Baird does not claim specific, personal harm as a result of insufficient or improper notice of a hearing.

Though not explained in Ms. Baird's Reply Brief, POMS DI 34121.013 is a prior version of the musculoskeletal Listing of Impairments used to evaluate claims involving musculoskeletal disorders, effective from September 29, 2016 to April 1, 2021. The later version, DI 34121.015,

26

was implemented by then-Commissioner Saul, and was effective from April 2 to July 22, 2021. Ms. Baird has not shown – and cannot show – that former Commissioner Saul's revisions to the musculoskeletal Listing of Impairments affected ALJ Schmitz's disability determination because Ms. Baird does not allege musculoskeletal impairments. Accordingly, Ms. Baird has not established any connection between the removal provision and the ALJ's determination to deny her benefits.

For the foregoing reasons, I find Ms. Baird's separation of powers claim lacks merit. Accordingly, I do not reach the Commissioner's alternative arguments concerning harmless error, de factor officer, the rule of necessity, and other prudential considerations. *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.").

## II.  The ALJ appropriately analyzed the Listings criteria at Step Three and his conclusions are supported by substantial evidence.

Ms. Baird next takes issue with the ALJ's Step Three analysis, alleging error with the Paragraph B analysis for mental disorders and asserting the ALJ failed to address all relevant evidence. (Pl.'s Br., ECF #13, PageID 610-13, 614-15).

At Step Three in the ALJ's evaluation process, the claimant may show that her impairment meets or equals a listed impairment, in which case, she will be considered disabled without regard

to age, education, and work experience. 20 C.F.R. §§ 404.1520(d) 416.920(d); *see Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, found in 20 C.F.R. Pt. 404, Subpart P, Appendix 1, defines impairments that SSA considers "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. §§ 404.1525 (a), 416.925(a); *see also Sullivan v. Zebley*, 493 U.S. 521, 531–32 (1990). A claimant's impairment must meet every element of a listing before the Commissioner will conclude at Step Three that the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). To do this, she "must point to specific evidence that demonstrates she reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).

The Sixth Circuit "does not require a heightened articulation standard at Step Three of the sequential evaluation process." *Marok v. Astrue*, No. 5:08CV 1832, 2010 WL 2294056, at *3 (N.D. Ohio June 3, 2010) (citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006)). However, a court must be able to conduct a meaningful review, and thus requires that the written decision make the reasons for the ALJ's decision sufficiently clear. *Id.* (citations omitted). Even if an ALJ's analysis at Step Three is not sufficiently clear, a court may affirm the ALJ's determination if there are sufficient factual findings elsewhere in the written decision that support the ALJ's Step Three conclusions. *See Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014).

At Step Three, the ALJ analyzed Ms. Baird's medically determinable impairments under Listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and

28

impulse-control disorders), and 12.15 (trauma- and stressor-related disorders). (Tr. 30). To meet Listing 12.08, the impairment must satisfy Paragraph A and Paragraph B criteria. *See* 20 CFR, Pt. 404, Subpt. P, App'x 1, 12.00(A)(2). To meet Listings 12.03, 12.04, 12.06, and 12.15, the impairment must satisfy either Paragraph A and Paragraph B criteria, or Paragraph A and Paragraph C criteria. *Id.*

Paragraph A includes the medical criteria that must be present within the medical evidence, while Paragraph B set forth the functional criteria an ALJ assesses to evaluate how a claimant's mental illness limits her functioning. *Id.* These are: understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* The ALJ rates a claimant's limitation in functioning (none, mild, moderate, marked, extreme). *Id.* To satisfy Paragraph B criteria, the claimant must show she has marked limitations in two, or an extreme limitation in one of the four areas of mental functioning. *Id.* To satisfy Paragraph C, a claimant must show her mental disorder is "serious and persistent," meaning that there must be medically documented history of the existence of the disorder over a period of at least two years; the evidence shows that the claimant relies upon medical treatment, mental health therapy, psychosocial supports, or highly structured settings to diminish the signs and symptoms of a mental disorder; and despite the diminished signs and symptoms, the claimant has only achieved marginal adjustment. *Id.* at 12.00(G). Where a claimant fails to meet the Paragraph B or C criteria, the ALJ need not discuss Paragraph A. *Webb v. Comm's of Soc. Sec.*, No. 1:19-cv-00123, 2019 WL 7944404, *19 (N.D. Ohio Oct. 21, 2019), *report and recommendation adopted*, 2019 WL 6695828 (N.D. Ohio Dec. 9, 2019).

Here, the ALJ did not analyze the Paragraph A criteria but concluded that Ms. Baird did not satisfy the Paragraph B or C criteria. The ALJ analyzed the Paragraph B criteria as follows:

In understanding, remembering or applying information, the claimant has a mild limitation. The claimant stated that she had obsessive-compulsive disorder. She stated that she heard auditory hallucinations, and had stress and panic attacks. She stated that she had difficulty with concentration. The claimant was consistently oriented to person, place, time and situation. She had no notable issues with memory but was noted to have cognitive impairment, which was related to concentration. Regardless, the claimant's treatment records and complaints did not indicate more than mild limitation in understanding, remembering, or applying information.

In interacting with others, the claimant has a moderate limitation. The claimant stated that she had mood swings, depression, anxiety disorder, panic disorder and could not stand to be around other people. She stated that she interacted with her family, but fought and argued with her mother and daughter. Mental status examination showed waxing and waning symptoms, but periods of severe anxiety. She was at times paranoid and reported hallucinations. However, she also discussed relationships with her family, friends, and a boyfriend during treatment. The record lacks evidence of significant disputes with others, or limited symptoms related to interaction with others that suggests more than moderate limitation in interacting with others.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant has stated that she had difficulty completing tasks. She stated that she had poor concentration. During treatment, the claimant had some limitations in attention and concentration. She reported that she had some symptoms of an obsessive compulsive nature. However, her statements did not suggest significant issues with her ability to complete tasks either in objective findings or complaints. Therefore, she has moderate limitation with regard to concentrating, persisting, or maintaining pace.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant stated that she had mood swings, depression, anxiety disorder, panic disorder and could not stand to be around other people. She stated she interacted with her family, but fought and argued with her mother and daughter. Mental status examination showed waxing and waning symptoms, but periods of severe anxiety. She was at times paranoid and reported hallucinations. However, she also discussed relationships with her family, friends, and a boyfriend during treatment. The claimant stated she had difficulty completing tasks. She stated that she had poor concentration. During treatment, the claimant had some limitations in attention and concentration. She reported that she had some symptoms of an obsessive-compulsive nature. However, her statements did not suggest significant

30

issues with her ability to complete tasks either in objective findings or complaints. Therefore, the claimant has a moderate limitation in adapting or managing oneself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record lacks evidence of a serious and persistent disorder, given the lack of treatment lasting two years or more. However, more importantly, the record does not suggest the need for a highly structured setting, medical treatment, mental health therapy, or psychosocial supports, or minimal capacity to adapt to changes in environment or demands that are not already part of daily life.

(Tr. 30-31) (citations omitted).

Ms. Baird argues the ALJ acknowledged the waxing and waning nature of her symptoms but "failed to take into account the records which document her problems when her symptoms were active." (Pl.'s Br., ECF # 13, PageID 611). The ALJ's written decision belies this assertion. The ALJ specifically referenced Ms. Baird's periods of severe anxiety, paranoia, and auditory hallucinations, but recognized Ms. Baird could interact appropriately with family, friends, and a boyfriend, which she discussed with her psychiatrist and therapist. (Tr. 30-31; *see also* Tr. 423, 494, 497, 498, 499, 500, 503, 509, 518). Her ability to do so suggests a lesser degree of limitation in her abilities to interact with others. The ALJ reasonably determined that, even though Ms. Baird does have mood swings, depression, anxiety, and panic disorder, because Ms. Baird could have those relationships, and did not put forth evidence of significant disputes with others, she was only moderately limited in her ability to interact with others.

Next, Ms. Baird claims that the evidence, as she described it in her Merits Brief, "indicated that [she] was seriously limited in her ability to function independently, appropriately, effectively, and on a sustained basis in at least two of the B criteria. (Pl.'s Br., ECF #13, PageID 611). I first

31

note Ms. Baird does not identify the two areas of mental functioning in which she is markedly limited. Moreover, the evidence underlying Ms. Baird's assertion is the same as that considered by the ALJ. Even if Ms. Baird can point to substantial evidence supporting her conclusion (*i.e.*, that she is markedly limited in two areas of mental functioning), this alone does not entitle her to remand. It bears repeating that even if substantial evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. And though she claims the ALJ misstated the evidence used to support his Paragraph B conclusions, (Pl.'s Br., ECF #13, PageID 611, 615), Ms. Baird makes no attempt to direct the Court to the alleged misstatements nor does my review of the record reveal any.

The ALJ's analysis of the relevant listings was supported by substantial evidence.

## III. The ALJ properly assessed Ms. Baird's residual functional capacity and his conclusions are supported by substantial evidence.

Finally, Ms. Baird claims the ALJ did not properly consider "the effect of the combination of her psychological impairments and whether they supported the RFC he proffered." (Pl.'s Br., ECF #13, PageID 615).

The RFC is what an individual can still do despite her limitations. SSR 96-8p. It is an administrative assessment of the extent to which an individual's impairments and related symptoms may cause limitations or restrictions that affect her capacity to do work-related activities. *Id*. An ALJ's RFC assessment must be based on all relevant evidence in the case record and must include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. "In rendering his RFC decision, the ALJ must give some indication of the

evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 744 F. Supp. 2d at 881.

Here, the ALJ summarized the medical evidence (Tr. 32-34), and noted the most significant findings were paranoid thoughts, engaging in risky behaviors, anxiety, irritability, and auditory hallucinations. (Tr. 36). He considered that these findings did not occur within the same visits and were interspersed between periods of findings including euthymic mood, no hallucinations, decreased anxiety, and normal personal interaction. (*Id.*). He addressed her moderately limited abilities in task completion, tolerance of stress, and personal interaction, (Tr. 36), by limiting her to positions involving simple, routine and repetitive tasks without high production or fast-paced work, limiting the degree to which she would interact with supervisors and small groups of familiar coworkers, limited the type of contact with others by restricting her from environments involving arbitration, negotiation, conflict resolution, or confrontation, restricted her from working on tasks in collaboration with others, and limiting her to positions where changes to routine are occasional and are easily explained before implementation. (Tr. 31-32).

Ms. Baird again lists a variety of evidence to conclude that she is precluded from engaging in any form of substantial gainful activity on a full-time basis. (Pl.'s Br., ECF #13, PageID 615-16). But all of this was considered in the ALJ's written decision. (Tr. 32-34). Ms. Baird's request is akin to asking the Court to re-weigh the evidence and come to a different conclusion, something the Court cannot do. *See Brainard*, 889 F.2d at 681.

Ms. Baird also argues the ALJ's analysis erroneously focused on normal findings "rather than reading the entire treatment note" and, as an example, cites to her initial intake appointment

at Portage Path on October 11, 2017. (Pl.'s Br., ECF #13, PageID 614). She claims: "The ALJ reported that [Ms.] Baird was oriented to person, place, time and situation with insight and judgment, but during the same examination she was noted to have a history of abuse, was socially isolated, had anhedonia, anxiety/panic, impulsivity, and insomnia." (*Id.*). I conclude this argument is without merit. A review of the ALJ's decision shows that, in addition to considering those normal findings from that particular appointment, he also considered her reported history of sexual assault, hearing voices, keeping to herself, spending money she does not have, and engaging in risky behavior. Such analysis belies any suggestion that the ALJ only selectively reviewed or relied on Ms. Baird's treatment records.

Finally, Ms. Baird alleges the ALJ, when formulating the RFC, did not adequately evaluate the statements she made about her subjective symptoms. (Pl.'s Br., ECF #13, PageID 617). She claims the ALJ failed to articulate any rationale beyond the boilerplate paragraph, disregarded any medical findings that would have precluded Ms. Baird from engaging in substantial gainful activity, and "failed to even mention the evidence which supported that [Ms.] Baird's symptoms were consistent with the medical evidence."

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief from pain or other symptoms; (6) any measures other than treatment an individual uses or used to relieve pain or other symptoms; and (7) any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms. *Id*. The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing–an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of

the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ gave due consideration to Ms. Baird's statements but also noted that her symptoms were not always present at the same time and were interspersed between periods of improved mood and decreased frequency of hallucinations, Ms. Baird managed some of her symptoms with art therapy and other coping skills, she was able to have normal personal interactions with family, and her medications were helpful in treating her symptoms. (Tr. 34, 36). The ALJ also found it noteworthy, and considered in his analysis, that Ms. Baird's treating providers suggested she return to work or refused to write a letter to her employer that she could not work. (Tr. 36).

Contrary to Ms. Baird's allegations that the ALJ failed to articulate any rationale beyond the boilerplate paragraph, the ALJ sufficiently articulated his reasons for finding her statements inconsistent with citations to the medical record and other statements Ms. Baird made to her therapists and psychiatrist. Moreover, Ms. Baird has not pointed to the medical findings or other evidence the ALJ allegedly disregarded in analyzing her statements.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying DIB and SSI.

Dated: April 22, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).